UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
EDWARD J. KESTLER,

                    Plaintiff,          07 Civ. 6271(DFE)

     -against-                OPINION AND ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.
----------------------------------X

DOUGLAS F. EATON, United States Magistrate Judge.

     Represented by Gary J. Gogerty, Esq., plaintiff Edward J.
Kestler seeks judicial review of a final decision of the
Commissioner of Social Security denying his application for
Disability Insurance Benefits.  Mr. Kestler alleges that he has
been unable to work since December 2003, four months after he
injured his neck and back operating a front-end loader.  (Tr.
64.)  The Administrative Law Judge ("ALJ") found that plaintiff
has a severe impairment (degenerative disc disease of the
cervical and lumbosacral spine) and mild depression.  The ALJ
agreed that Mr. Kestler is unable to perform his past job, but
found that he is able to perform "light work."

     For the reasons discussed below, (a) I grant plaintiff's
motion for judgment on the pleadings; (b) I deny the
Commissioner's motion for judgment on the pleadings; (c) I remand
the case to the Commissioner for further proceedings consistent
with this Opinion; and (d) I respectfully request the
Commissioner to give this case expedited consideration.

### TABLE OF CONTENTS

| | Page |
|---|---|
| Factual and Procedural Background | 2 |
| Plaintiff's Medical History | 4 |
| Discussion | 16 |
|  Point 1: The ALJ's Step Five finding was flawed. | 18 |
|  Points 2 and 4: The ALJ's Residual Functional Capacity finding was flawed. | 20 |
|  Point 3: The ALJ did not properly assess plaintiff's credibility and complaints of pain. | 23 |
| Conclusion | 27 |

## FACTUAL AND PROCEDURAL BACKGROUND

### Factual Background

Mr. Kestler was born on October 9, 1962. At the time of the March 2006 hearing, he was living with his wife and daughter in a house in Callicoon, New York, but his bank was preparing to foreclose on his home. (Tr. 313.)

He completed a 12th grade education, and he does not have any special vocational training. For almost 20 years, from 1984 through December 2003, he worked as a heavy equipment operator at a stone quarry. During an 8-hour work day, he was required to (a) sit for 8 hours, (b) walk, stand, climb, grasp and reach for 1 hour each, (c) frequently lift 25-50 pounds, and (d) occasionally lift 100-pound pieces of steel. (Tr. 77-78, 82, 291-92.)

In August 2003, plaintiff injured his back and neck on the job "after bouncing around" for several days in a front-end loader that had tires of three different sizes. (Tr. 152, 156, 293-94.) Despite his injuries, he continued to work until December 2003. (Tr. 293.) In August 2004, he began taking prescription medicine for depression. (Tr. 175, 219.) In November 2005, he started working as a manager in an equipment rental center. Although that was a "light work" job, he "had to leave after 5 weeks due to his neck and back pain." (Tr. 16, 295.) He has not worked since December 2005.

### Procedural Background

Mr. Kestler filed his Disability Insurance Benefit application on September 13, 2004 (Tr. 76-86), and it was denied on January 7, 2005, with a one-page explanation (Tr. 26). On January 21, 2005, he signed a form appointing Mr. Gogarty as his representative, and requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 28, 31.) After a delay of more than a year (see Tr. 27, 52, 313-14), plaintiff and Mr. Gogerty received a hearing before ALJ Neil R. Ross on March 1, 2006, in Goshen, New York. At the start of the hearing (Tr. 290), Mr. Gogerty submitted a letter brief on behalf of Mr. Kestler (Tr. 64-69). Neither a vocational expert nor a medical expert attended the hearing. (Tr. 288-315.)

During the hearing, plaintiff testified as follows. He is unable to work because of neck and back pain, and he also suffers from bilateral bottom rib pain, hip pain, throat and jaw pain.

He uses a neck brace, a back brace, prescription medications, over-the-counter pain relief, and a guard on his teeth at night because he grinds his teeth. He also suffers from depression, which is treated solely with medication. (Tr. 293-96, 299, 302-03, 305-09.)

Mr. Kestler testified that his pain prevents him from working because he cannot "do anything steady." He is able to remain standing for only a half-hour, sitting for a half-hour, and lying down for a half-hour. He has difficulty driving an automobile because of his back pain; he says that driving "[m]ore than a half-hour would put me on my back for three days." (Tr. 297.) He also suffers from a perception of tunnel vision; thus, for example, he would be unable to work as a monitor watcher for a security firm. (Tr. 301-02.)

He spends most of his day resting. He is able to make breakfast for himself, but his wife cooks the rest of the meals and she does most of the chores and shopping. He experiences pain when walking, standing, sitting, and sleeping, and he has difficulties playing sports, watching movies in a theater, and visiting his family and friends. (Tr. 87-97.)

On March 27, 2006, ALJ Ross issued an 8-page opinion denying Disability Insurance Benefits. (Tr. 14-21.) He found that: (1) plaintiff has degenerative disc disease of the cervical and lumbosacral spine, which is considered to be a severe impairment; (2) plaintiff's impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (3) plaintiff's allegations "regarding his pain and functional limitations are not credible to the incapacitating extent alleged"; (4) plaintiff retains the capacity to perform the physical exertion requirements of work except for that which requires lifting/carrying more than 20 pounds; (5) plaintiff retains the capacity to perform the full range of light work; and (6) plaintiff was not under a disability at any time through the date of the decision. (Tr. 20.)

On April 4, 2006, Mr. Gogerty filed an appeal to the Appeals Council. (Tr. 10.) On November 10, 2006, he submitted a five-page letter brief. (Tr. 283-87.) On May 10, 2007, the Appeals Council denied the request for review; hence the ALJ's decision became the final decision of the Commissioner. (Tr. 4-7.)

On July 9, 2007, plaintiff filed a Complaint in our Court. The Commissioner responded with an Answer and a one-volume transcript of the record. The case was originally assigned to Judge Stein; however, both parties consented to have a magistrate

judge handle this case for all purposes under 28 U.S.C. § 636(c), and the case was assigned to me on September 21, 2007.

On April 1, 2008, plaintiff moved for judgment on the pleadings. On May 6, 2008, the Commissioner opposed the motion and cross-moved for judgment on the pleadings. On May 22, 2008, plaintiff served a reply memorandum.

## PLAINTIFF'S MEDICAL HISTORY

1. Bodenstein Chiropractic

From August 18 to December 31, 2003, Mr. Kestler was treated at Bodenstein Chiropractic. (Tr. 152-53.) His chief complaints were "frequent, sharp, moderate to severe, right lower neck, shoulder, and upper back pain with radiation of sharp/shooting pain into his right arm," as well as "mild to moderate, achy, localized, bilateral low back pain." (Tr. 152.)

2. Dr. Paul D. Salzberg (the main treating physician)

On a regular basis since January 7, 2004, Mr. Kestler has been treated by Dr. Paul D. Salzberg, a primary care physician, for neck and back pain, and for depression. (Tr. 214-46; Tr. 256-76.)

On January 24 and 26, 2004, Dr. Salzberg referred plaintiff for magnetic resonance imaging ("MRI") scans of his cervical and lumbar spines. (Tr. 154-55.) The cervical spine MRI showed the following:

a. C6-C7 right posterolateral HNP [herniated nucleus pulposus] resulting in mild to moderate right neural foraminal stenosis and anterior recess stenosis on the right.

b. C5-C6 right posterolateral disc protrusion.

c. C3-C4 right posterolateral disc protrusion.

d. Modest components of uncovertebral joint osteoarthritis on the right at C5-C6 and C6-C7.

(Tr. 154.) The lumbar spine MRI showed L5-S1 diffuse disc bulge but no HNP at any lumbar level. (Tr. 155.)

On February 23, 2004, Mr. Kestler complained of difficulty sleeping, neck pain, muscle strain in his tongue and jaw,

-4-

cracking in his mid-back when bending, and numbness in his left buttock with needle-like pain. On examination, he had decreased range of motion in his cervical spine, and tenderness in his lower neck. Dr. Salzberg diagnosed a herniated disc at C6-C7 and a disc bulge at L5-S1. He referred plaintiff for a neuro surgical consult and prescribed Vicodin for pain and Voltaren, an anti-inflammatory drug. (Tr. 222.)

On March 15, 2004, Mr. Kestler told Dr. Salzberg that he was "feeling about the same." He had been going to physical therapy (see Tr. 165-66), and had full range of motion in his cervical spine, but tenderness on the left side of his neck. In addition to the prescription drugs, Dr. Salzberg prescribed a cervical collar and physical therapy. (Tr. 223.)

On April 6, 2004, Dr. Salzberg referred plaintiff for a CT scan of his brain. The results were described as "unremarkable." (Tr. 159.)

On April 12, 2004, plaintiff's laboratory tests and CT scan results were normal. Dr. Salzberg diagnosed cervical disc disease and noted decreased range of motion in his neck. (Tr. 221.)

On May 12, 2004, Dr. Salzberg noted that Mr. Kestler was "emotionally upset over disability" but was not suicidal. On examination, plaintiff experienced pain in his midline cervical spine and decreased range of motion in his neck. Dr. Salzberg repeated his diagnosis of cervical disc disease and recommended rest and follow-up visits with a neurologist. (Tr. 221.)

On May 31, 2004, Mr. Kestler complained of tunnel vision while driving, pain and tremors in his right arm, and trouble sleeping. On examination, Dr. Salzberg noted full range of motion in his cervical and lumbar spines, with no tenderness in his cervical or lumbar muscles. Dr. Salzberg wrote, "persistent pain subjective?" He diagnosed rigidity in right arm and vision loss. (Tr. 220.)

On June 8, 2004, plaintiff complained of pain in his lower posterior rib cage and in his lower back. He was wearing a soft collar. He said that he felt depressed, with loss of interest in activity. Dr. Salzberg diagnosed chronic neck pain, rib pain, and depression. He referred plaintiff to a pain clinic, and he prescribed Lexapro to treat depression. (Tr. 218.)

On June 30, 2004, Mr. Kestler had the same back pain, but it was helped by the Lexapro and by a back brace. Upon examination,

plaintiff had pain in his posterior rib cage.  His depression was better and his other results were normal.  Dr. Salzberg diagnosed chronic neck and posterior rib pain.  (Tr. 218.)

On July 30, 2004, plaintiff complained of cervical pain. Dr. Salzberg diagnosed chronic neck pain, chronic thoracic pain, and depression.  The doctor also reported that plaintiff had not yet been approved for physical therapy.  The doctor had similar findings on August 20, 2004.  He recommended that plaintiff continue taking the same medication, and start physical therapy and pain management.  (Tr. 219.)

On September 29, 2004, Dr. Salzberg diagnosed chronic neck pain, chronic thoracic pain, and depression.  (Tr. 217.)

On October 29, 2004, Mr. Kestler complained of neck pain, grinding teeth, rib pain, and jaw pain.  Dr. Salzberg reported full range of motion in plaintiff's cervical spine, no jaw dysfunction, and tenderness in the lower rib cage.  (Tr. 217.) On December 2, 2004, Dr. Salzberg's findings were similar, but there was no tenderness in plaintiff's cervical spine.  Dr. Salzberg diagnosed chronic neck pain and bruxism (involuntary nighttime teeth grinding), and recommended a dental evaluation. (Tr. 216, 269.)

On January 12, 2005, Dr. Salzberg reported that plaintiff saw his dentist and received night guards for his teeth. Plaintiff complained of neck and shoulder pain.  (Tr. 216, 269.)

On February 4, 2005, Dr. Salzberg noted that Mr. Kestler "took a long ride yesterday" and was still having neck and back pain.  Plaintiff complained of pain across his ribcage and jaw, and fatigue in his eyes.  He had full range of motion in his cervical spine, but was diagnosed with chronic back pain.  His mood seemed to be better with the Lexapro.   (Tr. 215, 268.)

On March 2, 2005, plaintiff complained of neck, back and jaw pain.  Dr. Salzberg diagnosed chronic neck and back pain.  His plan was for plaintiff to continue taking his medications and to rest.  (Tr. 267.)

On March 30, 2005, Mr. Kestler complained of chronic neck and back pain, as well as jaw pain and depression.  On physical exam, pain radiated to his shoulders and lumbosacral spine region with decreased deep tendon reflexes bilaterally to the knees, and pain at straight leg raising at 20 to 25 degrees.  The pain also radiated to the lumbosacral region to the left leg, with some complaints of paresthesias (abnormal sensations) to the left

buttock. Once again, Dr. Salzberg diagnosed chronic neck and back pain, and depression. He recommended the same course of treatment. (Tr. 242, 264, 267.)

On April 28, 2005, plaintiff complained of chronic back pain, fatigue, and increased sweating. He was diagnosed with chronic back pain and fatigue. (Tr. 214, 240, 263, 266.)

On May 26, 2005, Mr. Kestler was diagnosed with "work related back pain, chronic in nature at this point," elevated cholesterol, and depression. It was noted that the back pain was making plaintiff "nauseous." (Tr. 214, 238, 262, 266.)

On June 23, 2005, plaintiff complained of persistent neck and back pain, persistent teeth grinding, visual disturbances, back pain, and excessive sleepiness. He wore a neck brace 70% of the time and used a mouth guard at night to prevent grinding. Dr. Salzberg noted that plaintiff's medication interfered with his ability to drive an automobile, and "this can affect any future work situation if medications are going to be needed." Neck tenderness was noted on both sides of the neck, and there was scant tenderness in his lower back. Mr. Kestler had limited range of motion, but full flexion and full extension. Dr. Salzberg diagnosed chronic back and neck pain, bruxism, and visual disturbance. He prescribed Vicodin three times a day and Ultracet every six hours as needed for pain. Dr. Salzberg stated that plaintiff was "unable to return to a job that requires lifting or any driving for an extended period of time." Plaintiff was scheduled to meet with a surgeon to discuss whether he would be a candidate for a disc replacement. (Tr. 214, 236-37, 260-61.)

Dr. Salzberg filled out a Worker's Compensation form that same day. He reported that plaintiff had chronic neck and back pain, vision difficulties, and ground his teeth. He said that plaintiff's prognosis was guarded. With respect to the question about any limitations that might have an impact on employment, Dr. Salzberg wrote that plaintiff had (a) chronic fatigue/ weakness, (b) impaired concentration, (c) an inability to focus for sustained periods, (d) the need for frequent breaks, (e) chronic pain, and (f) difficulty coping. He said that plaintiff would be unable to return to his previous occupation, and that he would be unable to work a full day. He also said that plaintiff's ability to drive or use public transportation was limited due to pain medication. (Tr. 244-45.)

On July 21, 2005, Mr. Kestler had less neck pain, "but it [was] still present." He took Vicodin "every so often," but he

did not really want to take it because it made his "thinking cloudy." He complained of pain in his lower extremities, which he believed was caused by the Lipitor he took to lower his cholesterol. Dr. Salzberg diagnosed chronic back and neck pain and elevated cholesterol. (Tr. 214, 232, 259, 266.)

On August 15, 2005, Dr. Salzberg reported that plaintiff's leg pain improved when he stopped taking Lipitor. He diagnosed elevated cholesterol and chronic neck pain. (Tr. 214, 231, 258, 266.)

On September 23, 2005, Dr. Salzberg wrote that:

Ed worked at a different job, and he was sitting and standing a lot, but he had no heavy lifting. However, even this type of work did aggravate his pain and he had pain in his lower ribcage that was quite severe.

(Tr. 229.) "On physical exam ... there is some epigastric (upper middle region of the abdomen) tenderness, and some tenderness in the lower ribcage." The doctor's impression was chronic pain, and he planned to "try some analgesic medicine, have [plaintiff] rest for a couple of weeks and see if he can return to work at some future time." (Tr. 229.)

On October 31, 2005, Dr. Salzberg reported that "since last visit patient has been lying on his back due to pain." The Vicodin helps "sometimes," but he stopped taking Voltaren because it was not helping. (Tr. 265.) That same day, Dr. Salzberg filled out an SSA form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." (Tr. 251-54.) Dr. Salzberg reported that, in an 8-hour work day, plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) stand and/or walk less than 2 hours; and (3) sit less than 6 hours. He also said that plaintiff's ability to push and/or pull was limited in both his upper and lower extremities. In response to the question about the medical/clinical findings used to support his conclusion, Dr. Salzberg wrote: "Herniated disc [singular] in neck & back - - persistent pain[,] pain level 8-9 in low back." (Tr. 252.) I note that, in all his other reports, Dr. Salzberg was careful to note that there was a herniation in one disc in the neck, but only a bulge in a disc in the lumbar region of the back.

Dr. Salzberg reported that, due to lower back pain, plaintiff (1) could never climb ramps, stairs, ladders, ropes or scaffolds; (2) could never balance or crawl; and (3) could only occasionally kneel, crouch and stoop. (Tr. 252.) Dr. Salzberg

said that plaintiff had the following manipulative limitations: (1) limited ability in reaching in all directions, including overhead -- this could be done occasionally; (2) limited ability in handling (gross manipulation) -- this could be done occasionally; (3) unlimited ability in fingering (fine manipulation) and feeling. (Tr. 253.) The doctor's findings were based on the fact that plaintiff had pain with repetitive movements. (Tr. 253.) He also said that plaintiff had limited visual limitations because of occasional blurred vision, but no hearing or speaking limitations. (Tr. 253.) In addition, Dr. Salzberg reported that the back and neck pain required plaintiff to avoid sneezing and therefore to avoid: temperature extremes, dust, vibration, humidity/wetness, fumes, odors, chemicals and gases, in addition to machinery and heights. (Tr. 254.)

On November 7, 2005, Dr. Salzberg completed a Physical Residual Functional Capacity Assessment for the SSA. (Tr. 277-81.) At the outset, he diagnosed chronic neck and back pain, and said that Mr. Kestler's prognosis was poor. He listed plaintiff's symptoms and pain as follows:

Both lower rib cages hurt. Sciatic pain bilateral. Pain in jaw, bruxism, pain in throat and blurred vision. Pain in throat. Driving increased pain. Localized pain in neck, lower back - constant.

(Tr. 277.) Asked to identify clinical and objective signs, he wrote:

MRI C [cervical] spine 1/26/04 Herniated disc C6-C7. MRI LS [lumbar] spine diffuse disc bulge 1/26/04[.]

(Tr. 277; to the left of this, he wrote additional notes that I find difficult to decipher.) Asked "Is your patient a malingerer?" Dr. Salzberg answered no. He also answered that plaintiff was "incapable of performing even 'low stress' jobs." (Tr. 278.)

At Tr. 279-81, Dr. Salzberg opined that plaintiff: (1) could walk for 1 city block without rest or severe pain; (2) could sit for 1 hour at one time before he needed to get up; (3) could stand for 30 minutes at one time before he needed to sit down or walk around; (4) could stand/walk for less than 2 hours in an 8 hour workday; (5) needed to include periods of walking around during an 8-hour work day, every 10 minutes, for 10 minutes at a time; (6) needed a job that permits shifting positions at will from sitting, standing or walking, and that depending on the day, would need to take unscheduled breaks; (7) needed to elevate his

legs with prolonged sitting; (8) would need to use a back brace or a collar on his neck; (9) could occasionally look down, turn his head right or left and look up; (10) could never hold his head in a static position; (11) could rarely twist, stoop (bend), crouch, and climb ladders; (12) could occasionally climb stairs; (13) had significant limitations in doing repetitive reaching, handling or fingering, namely he could reach with his arms, including overhead, only 10% of the time in an 8 hour work day; and (14) would be absent from work more than 4 days a month due to his impairments.

### 3.  Dr. Jack Stern

On February 23, 2004, plaintiff saw Dr. Jack Stern, a neurosurgeon.  (Tr. 156.)  Dr. Stern reported that Mr. Kestler had "generalized neck pain, back pain without significant radiculopathy, without significant focality except for very positive mechanical signs.  He said that he had reviewed the MRIs and that the cervical spine "reveals multiple levels of degeneration from C2-3 up to C7 without nerve root or thecal sac compression."  He also said that the MRI of the lumbar spine showed internal disruption at L5-S1 without significant nerve root or thecal sac compression.  He noted that plaintiff would not be a candidate for surgery, and instead recommended a pain management consultant.  (Tr. 156.)

### 4.  Dr. Barry Scheinfeld

Plaintiff was seen twice by Dr. Barry Scheinfeld (a physiatrist at Catskill Rehabilitation and Sports Medicine).  On March 1, 2004, plaintiff reported constant neck and back pain, and pain in his right arm.  (Tr. 170-74.)  On examination, cervical flexion was to 40 degrees, extension to 50 degrees, and rotation 45 right and 50 left.  Muscle strength, deep tendon reflexes, and lumbar range of motion were full.  He had diminished sensation in his right posterior arm and some muscle contraction in his neck.  Dr. Scheinfeld diagnosed cervical disc impairment with multiple right-sided cervical radiculopathy, low back pain, and an underlying disc bulge.  The doctor recommended that plaintiff have (a) rehabilitation to improve plaintiff's range of motion in his neck, strengthen the abdominals, and decrease muscle spasms, (b) home cervical traction, (c) possible trigger point injections, and (d) an EMG test to evaluate numbness.  Dr. Scheinfeld stated that plaintiff should "avoid lifting, carrying, driving a loader," or any activity "involving traumatic up and down movements such as running, jumping, or driving a loader where he would have to bounce."  (Tr. 170-72.)

On April 20, 2004, plaintiff saw Dr. Scheinfeld for rehabilitation. Plaintiff said that, for the past 8 months, he had tunnel vision and anterior throat, neck, and jaw pain. Dr. Scheinfeld did not find any rigidity and plaintiff's reflexes were normal. However, he did find muscle spasm and limited range of motion at the neck. He diagnosed a cervical disc with right-sided radiculopathy. (Tr. 209.)

### 5. Dr. Bernard Rawlins

On March 10, 2004, plaintiff saw Dr. Bernard Rawlins, a surgeon at the Hospital for Special Surgery. (Tr. 157-58.) Mr. Kestler reported that physical therapy twice a week was helping him, but that he could not return to work. Physical examination was unremarkable. Dr. Rawlins reviewed the January 2004 MRI of the cervical spine and noted that there was no evidence of significant canal or foraminal compromise. His review of the January 2004 MRI and plain x-rays of the lumbar spine showed a small midline L2-L3 herniation and a bulge at L5-S1, which was also without significant canal or foraminal compromise. (Tr. 157.) He diagnosed myofascial sprain strain syndrome of the neck and low back, and recommended that plaintiff continue non-operative management of his complaints with his rehabilitation physician. (Tr. 158.)

### 6. Dr. Ira Neustadt

On May 14, 2004, Mr. Kestler saw neurologist Dr. Ira Neustadt. (Tr. 160-63.) He complained of pain and stiffness in his neck, numbness in his jaw, soreness in his tongue, and difficulty focusing with his eyes. Dr. Neustadt noted that, at the present time, plaintiff was not having any classic radicular pain that could be attributed to a herniated disc at C6-C7. Dr. Neustadt reported that plaintiff's neurological exam was "nonfocal and within normal limits." (Tr. 160.) Plaintiff had "fairly full" range of motion of his neck, with no significant tenderness in his cervical paraspinals, but there was mild tenderness to the intercostal and rib area "which could suggest a mild contusion or musculoskeletal pain." Straight leg raising was to 90 degrees in supine and sitting positions and there was no radicular pain. Dr. Neustadt noted that the MRIs showed degenerative disc disease in the cervical region, and that plaintiff had primarily myofascial (inflammation of muscle and its tissue) and neurasthenic (chronic mental and physical weakness and fatigue caused by exhaustion to the nervous system) symptoms. (Tr. 161.) He recommended (1) stress reduction and counseling to reduce his sense of anxiety and fear of further

injury, (2) a "VESID [1] type program to determine if he can have a
job that may be more suitable in the future given his MRI scan
findings of degenerative disc disease", (3) mild physical
therapy, and a home base exercise program, (4) that plaintiff
stop drinking alcohol and stop smoking cigarettes, and (5)
medication for depression. (Tr. 161.)

        7.    Dr. Lawrence Schulman (not to be confused
              with the next doctor, Dr. Anita Shulman)

        On July 8, 2004, Dr. Lawrence Schulman conducted an
independent orthopedic medical examination for plaintiff's
Workers' Compensation claim. (Tr. 210-213.) He concluded that
plaintiff had a minimal to mild partial disability (Tr. 213), but
he was unconvinced this was caused by an on-the-job incident. I
note that Dr. Schulman did not have the August 18 to December 31,
2003 treatment records from Bodenstein Chiropractic; hence he
erroneously concluded that "claimant ... did not seek treatment
until a lay off in 12/03." (Tr. 210.) Dr. Schulman wrote that:

        There is no definite history of any injury to the
        neck or low back but development gradually and slowly
        of symptoms in his neck and back secondary to
        repetitive microtrauma from the use of heavy equipment.
        Treatment was not sought for a number of months. The
        claimant has no evidence to support any clinical
        diagnosis of any disc disease or significant clinical
        entities in the neck or low back. I cannot state the
        etiology of his symptoms, but I do not believe that
        they are attributable to the so-called use of the front
        loader machine."

(Tr. 212.) As a result of this finding, plaintiff was denied
further physical therapy by Workers' Compensation. (Tr. 212.) [2]

        Dr. Schulman reviewed the January 2004 MRIs. He wrote that

_____

        [1]    VESID is "an office of the New York State Education
Department" that offers "New Yorkers who have a disability an
opportunity to become independent through education, training and
employment. [It] provide[s] vocational rehabilitation services
to eligible individuals to prepare them for suitable jobs." (See
www.vesid.nysed.gov/do/handbook.htm.)

        [2]    I do not know whether it would make a difference if
plaintiff's counsel were to contact the Workers' Compensation
Board and provide the Bodenstein Chiropractic treatment records.

the MRI of the cervical spine "was said to show multiple protrusions but interpreted by other physicians as showing no significant neural or canal encroachment," and that the MRI of the low back showed "L5-S1 bulge with no herniation."  (Tr. 210.)

Dr. Schulman reported that plaintiff's present complaints included (a) discomfort in his jaw, eyes and Adams apple but no radicular pain, (b) occasional pain in the posterior aspect of his neck, (c) no headaches, (d) some crackling, (e) constant pain in the lower rib cage in the para thoracolumbar area, (f) occasional pain in the left buttocks, and (g) no true radicular pain or true discogenic lumbar pain.  (Tr. 211.)

Upon examination, Dr. Schulman found minimal tenderness of the right paracervical area, full flexion and extension without any pain in the neck, full rotation to the right, but left rotation was to 45 degrees.  Lateral bending was full, with slight pain to the right.  Normal motor and sensory examinations of the upper extremities, and plaintiff had a full painless range of motion of the shoulders, elbows, wrists and forearms. Examination of the thoracolumbar and lumbar areas showed no spasm or tenderness, and a neurological exam of the lower extremities was normal.  (Tr. 212.)  Dr. Schulman diagnosed myofascial strain of the neck and thoracolumbar spine, without evidence of discogenic disease.  He recommended conservative care without surgical intervention, and possible injection therapy in his neck and lower back.  (*Id.*)  He opined that plaintiff had a minimal to mild partial disability.  (Tr. 213.)

### 8.  Dr. Anita Shulman (not to be confused with the previous doctor, Dr. Lawrence Schulman)

On December 15, 2004, Dr. Anita Shulman, a consultative internist, examined Mr. Kestler.  (Tr. 180-83.)  Plaintiff did not say that he was experiencing pain during this examination, but he said that when he did experience pain, it rated a 9 on a scale of 1 to 10.  (Tr. 180.)  Dr. Shulman reported that plaintiff had a "bulge at the L5-S1 level" and "C5-C7 disk protrusion with evidence of osteoarthritis at C6-C7."  (Tr. 180.)

Dr. Shulman saw plaintiff on the same day as Dr. Hartman (a consultative psychologist whom I discuss next).  As will be seen, there are differences in their reports concerning plaintiff's daily activities.  The ALJ pointed to Dr. Shulman's version, which simply said that plaintiff "assists with cooking, cleaning, laundry, shopping, and bathing."  (Tr. 281.)  As will be seen, Dr. Hartman's version gave more detail and said that plaintiff's activities were somewhat more limited.  Dr. Shulman mistakenly

noted that plaintiff weighed 270 pounds (instead of 220 pounds). (Tr. 181, but see Tr. 291-92.)

On examination, Dr. Shulman reported normal gait, stance, neck, abdomen, chest, lungs, and heart. Cervical and lumbar spine examinations showed full flexion, extension, and bilateral rotary movement. There was full range of motion of shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally. (Tr. 182.) Neurologic and extremity examinations, as well as fine motor activity, were normal. (*Id*.) Dr. Shulman diagnosed osteoarthritis of the cervical spine, cervical disc protrusion, and lumbar disk protrusion. (Tr. 183.) She opined that plaintiff's prognosis was fair, and that there was "no need for restrictions to be placed other than restrictions on moderate to marked pushing, pulling, lifting, and carrying." (*Id*.)

9. Dr. Brett Hartman

On December 15, 2004, Dr. Brett Hartman, a consultative psychologist, examined Mr. Kestler. (Tr. 175-79.) Plaintiff reported that he had never had outpatient mental health services; instead he took Lexapro for depression, which has "helped significantly." Plaintiff complained that he suffers from mild sleep problems, waking up about 6 times per night and dozing off during the day. He also experienced significant weight gain, occasional episodes of sadness and guilt, and episodic over-drinking. (Tr. 175-76.)

Dr. Hartman reported that plaintiff does not do the laundry. He prepares simple meals and is able to do some light cleaning. He goes shopping, but only for a few items at a time. He drives, but with significant pain. He spends most of his time reading, watching television, playing with his cat and seeing his brother-in-law. (Tr. 177-78.)

On examination, Dr. Hartman reported (a) fluent and clear speech, (b) coherent and goal directed thought processes, (c) restricted but pleasant affect, (d) mildly dysphoric mood, (d) full orientation, (e) intact attention, concentration and memory, (f) average intellectual functioning, and (g) average intellectual functioning, with fair insight and judgment. (Tr. 177.) With regard to plaintiff's vocational and functional capacities, Dr. Hartman opined that plaintiff: (1) could follow and understand simple directions and instructions; (2) could learn new tasks and make appropriate decisions; (3) had fair attention and concentration; (4) had mild difficulty maintaining a regular schedule and is likely to have mild difficulty performing certain tasks, especially those that would create

-14-

strain to his neck or back; (5) had fair ability to relate with
others; and (6) would likely have fair ability to deal with
normal life stressors. (Tr. 178.) He gave the diagnosis of
"adjustment disorder with depressed mood, [rule out] pain
disorder," and recommended an alternative form of pain
management. He then said that plaintiff's prognosis was "fair
given his past high level of functioning." (Tr. 178.)

    10. <u>Kim Testa</u>

On December 24, 2004, Kim Testa (a Disability Analyst II for
the SSA) filled out a physical residual functional capacity
("RFC") assessment for plaintiff. (Tr. 185-89.) It seems clear
that Testa is not a physician; indeed Testa crossed out the
signature line that said "Medical Consultant's Signature" and
instead wrote "Disability Analyst II." (Tr. 189.) Testa and Dr.
Salzberg were the only two persons who provided a physical RFC
assessment on the extensive SSA form for RFC assessments. (Dr.
Anita Shulman did not fill out an SSA form, although she did say
that plaintiff had "restrictions on moderate to marked pushing,
pulling, lifting, and carrying.") Nevertheless, the ALJ decided
not to give "great weight" to the RFC assessment of Dr. Salzberg,
plaintiff's long-time treating physician. (Tr. 19.)

Testa did not examine plaintiff. Based on the medical
records contained in plaintiff's file, Testa opined that, in an
8-hour work day, plaintiff could (1) lift ten pounds frequently
and twenty pounds occasionally, (2) stand, walk or sit about 6
hours each in an 8-hour workday, (3) push and pull, (4)
occasionally climb, stoop, kneel, crouch and crawl, (5)
frequently balance. Testa also opined that plaintiff had no
manipulative, visual, communicative, or environmental
limitations. (Tr. 185-87.)

Testa wrote that plaintiff's statements regarding ambulation
"are found to be not credible," and that the "remainder of his
statements regarding functional limitations are vague and
credibility assessment is not possible." (Tr. 188.) Testa also
disagreed with Dr. Anita Shulman's findings:

    CEMD Anita Shulman, in her report of 12/15/04,
    states that claimant is moderately limited to pushing,
    pulling, lifting and carrying. This opinion is not
    adopted, as it is non-specific.

(Tr. 188.) I do not see why Testa thought Dr. Anita Shulman's
opinion was "non-specific."

Testa viewed the records as of December 2004.  Therefore,
Testa did not see the 2005 records, and did not see the RFC
assessment of Dr. Salzberg, which was written in November 2005.
As will be seen, the ALJ adopted the 12/24/04 opinion of the
non-examining non-physician Testa, and rejected the 12/15/04
opinion of Dr. Anita Shulman and the 11/7/05 RFC assessment of
the long-time treating physician Dr. Salzberg.

### 11.  Dr. Joseph Dambrocia

On December 27, 2004, Dr. Joseph Dambrocia (a psychologist
for the SSA) did not examine plaintiff; he reviewed the evidence
in the record as of 2004, and prepared a mental RFC assessment.
(Tr. 194-206.)  Dr. Dambrocia opined that plaintiff had
moderately limited difficulties in:  (a) performing activities
within a schedule, maintaining regular attendance, and being
punctual within customary tolerances; (b) interacting
appropriately with the general public; and (c) maintaining social
function.  (Tr. 190-91, 204.)  He opined:  "Based on psychiatric/
cognitive limitations, the claimant is viewed as able to
understand and remember instructions, sustain attention and
concentration for tasks, relate adequately with others, and adapt
to changes."  (Tr. 192.)

## **DISCUSSION**

Our Court's review "is limited to inquiring into whether the
[Commissioner's] conclusions are supported by substantial
evidence in the record as a whole or are based on an erroneous
legal standard."  *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d
Cir. 1997), *quoting Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.
1990).  Pursuant to 42 U.S.C. § 405(g), "[t]he findings of the
Commissioner of Social Security as to any fact, if supported by
substantial evidence, shall be conclusive..."

In evaluating a disability claim, the Social Security
regulations require the Commissioner, through the ALJ, to apply a
five-step process:

> First, the [Commissioner] considers whether
> the claimant is currently engaged in
> substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the
> claimant has a "severe impairment" which
> significantly limits his physical or mental
> ability to do basic work activities.  If the
> claimant suffers such an impairment, the
> third inquiry is whether, based solely on

> medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of
> the regulations.  If the claimant has such an
> impairment, the [Commissioner] will consider
> him disabled without considering vocational
> factors such as age, education, and work
> experience. . . .  Assuming the claimant does
> not have a listed impairment, the <u>fourth</u>
> inquiry is whether, despite the claimant's
> severe impairment, he has the residual
> functional capacity to perform his past work.
> <u>Finally</u>, if the claimant is unable to perform
> his past work, the [Commissioner] then
> determines whether there is other work which
> the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999), *quoting Berry
v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (my emphasis
added).

At <u>Step One</u>, ALJ Ross determined that plaintiff had not
engaged in substantial gainful activity since the date of his
alleged onset of disability.  (Tr. 16, 20.)  At <u>Step Two</u>, the ALJ
found that plaintiff "has the following 'severe' impairment:
degenerative disc disease of the cervical and lumbosacral spine."
(Tr. 20.)  At <u>Step Three</u>, the ALJ found that plaintiff did not
have an impairment that was equal in severity to one listed in
Appendix 1 of 20 C.F.R. Part 404, Subpart P.  (Tr. 18, 20.)  At
<u>Step Four</u>, the ALJ found that plaintiff was precluded from
performing his past relevant work.  He then determined that
plaintiff "retains the residual functional capacity to perform
the full range of light work," excluding heavy lifting or
strenuous physical exertion.  (Tr. 18, 20.)  At <u>Step Five</u>, the
ALJ found that plaintiff was a "younger individual" with a high
school education and a history of skilled work as a heavy
equipment operator that could not be transferred to other skilled
or semi-skilled light or sedentary occupations.  He concluded
that under the medical vocational guidelines (Rule 202.21 in
Table No. 2 of Appendix 2, Subpart P, Regulation No. 4),
plaintiff was not disabled.

Plaintiff's attorney argues that the ALJ's decision was not
"supported by substantial evidence" and/or "contains errors of
law."  (Pl. Memo. p. 6.)  His memorandum of law, at pages 6-7,
summarized his four points as follows:

Point 1.  The ALJ "failed to meet his burden at Step Five
... in that he relied exclusively on the medical vocational

guidelines, or grids, where[as] the Claimant's exertional
impairments are compounded by significant nonexertional
impairments limiting capability for sedentary work."

Point 2. "The ALJ fail[ed] to set forth his residual
functional capacity finding in a manner sufficient to allow a
reviewing court to carry out its reviewing function."

Point 3. "The ALJ erred in assessing plaintiff's
credibility and failed to evaluate his subjective complaints of
pain properly."

Point 4. "The ALJ may not ignore reports of treating
physicians or selectively pick and choose[] portions of medical
reports .... Additionally, the ALJ failed to develop the
Administrative record."

After reviewing the record, I agree with plaintiff's four
points, and I remand the case to the Commissioner. My reasons
are as follows (I will fold Point 4 into Point 2).

<u>Point 1: The ALJ's Step Five finding was flawed.</u>

Pursuant to Rule 404.1569a(d), the use of the grids to
determine Step Five is improper where a plaintiff has both
exertional and nonexertional limitations. "[I]f a claimant's
nonexertional impairments 'significantly limit the range of work
permitted by his exertional limitations' then the grids obviously
will not accurately determine disability status because they fail
to take into account claimant's nonexertional impairments."
*Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996), *quoting Bapp v.
Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986). In such a situation,
the ALJ must "introduce the testimony of a vocational expert (or
other similar evidence) that jobs exist in the economy" which the
plaintiff could obtain and perform. *Rosa v. Callahan*, 168 F.3d
72, 78 (2d Cir. 1999), *quoting Bapp*, 802 F.2d at 603; *Pratts*, 94
F.3d at 39.

In the case at bar, the ALJ found that plaintiff's
depression "did not interfere with his ability to work." The ALJ
then proceeded to rely on the grid for light work (Rule 202.21 in
Table No. 2 of Appendix 2, Subpart P, Regulation No. 4). The ALJ
concluded that plaintiff "retains the residual functional
capacity to perform the full range of light work." The ALJ did
not use a vocational expert. Other than depression, the ALJ did
not discuss nonexertional limitations. However, various
physicians had reported that plaintiff has nonexertional
limitations in addition to depression, and Mr. Gogerty had

outlined some of those limitations in his March 1, 2006 letter to the ALJ. (Tr. 64-69.) I shall now summarize the assessments made by the doctors:

Dr. Salzberg's assessment:

Exertional limitations: pain [3]; restrictions with respect to lifting, carrying, standing, walking, sitting, and pushing and pulling in both upper and lower extremities. (Tr. 251-54, 277-81.)

Nonexertional limitations: pain; depression; difficulty in paying attention and concentrating; postural limitations with respect to climbing, balancing, crawling, kneeling, crouching and stooping; manipulative limitations with respect to reaching in all directions and handling; visual limitations; environmental limitations with respect to temperature extremes, dust, vibration, humidity, wetness, fumes, odors, chemicals and gases; it was also noted that plaintiff's medications interfere with his ability to drive an automobile. (Tr. 236-37, 244-45, 251-54, 260-61, 277-81.)

Dr. Scheinfeld's assessment:

Exertional limitations: pain; avoid lifting, carrying, driving, running, jumping or driving a loader that would bounce. (Tr. 171-72.)

Dr. Neustadt's assessment:

Nonexertional limitations: pain; anxiety; depression. (Tr. 160-63.)

Dr. Hartman's assessment:

Nonexertional limitations: depression; "mild difficulty maintaining a regular schedule and is likely to have mild difficulty performing

---

[3]     Pain can be a symptom of both exertional and nonexertional limitations. See 20 C.F.R. § 404.1569a(b) and (c).

certain tasks, especially those that would
create strain to his neck or back."  (Tr.
178.)

Dr. Shulman's assessment:

Exertional limitations: moderate to marked
pushing, pulling, lifting and carrying.
(Tr. 183.)

Dr. Dambrocia's assessment:

Nonexertional limitations: adjustment
disorder with depressed mood; moderately
limited difficulties in plaintiff's ability
to perform activities within a schedule,
maintain regular attendance, and be punctual
within customary tolerances; moderately
limited difficulties in plaintiff's ability
to interact appropriately with the general
public; and moderately limited difficulties
in plaintiff's ability to maintain social
function.  (190-91, 204.)

The ALJ should have discussed those reports of plaintiff's
exertional and nonexertional limitations, especially the reports
of constant pain.  The ALJ should have discussed Dr. Neustadt's
recommendation that a VESID type program be considered to
determine if plaintiff "can have a job that may be more suitable
in the future given his MRI scan findings of degenerative disc
disease."  Moreover, the ALJ should have consulted with a
vocational expert to determine plaintiff's capacity for work.
Accordingly, I find that the ALJ did not comply with 20 C.F.R. §
404.1569a, and I remand the case to the Commissioner so that the
ALJ can make a new Step Five determination.

Points 2 and 4:  The ALJ's Residual Functional
Capacity finding was flawed.

Residual Functional Capacity ("RFC") is defined as the most
an individual can do despite his physical and mental limitations.
20 C.F.R. § 404.1545.  A person's ability to work may be reduced
(a) by a limited ability to perform certain physical demands of
work activity, such as sitting, standing, walking, lifting,
carrying, pushing, pulling or other physical functions, including
manipulative and postural functions such as reaching, handling,
stooping and crouching, or (b) by a limited ability to perform
certain mental activities, such as limitations in understanding,

remembering, carrying out instructions, responding appropriately to supervision, co-workers, and work pressures in a work setting. 20 C.F.R. § 404.1545. In addition, visual impairments and environmental restrictions may also reduce the individual's ability to work. *Id.*

In the case at bar, the ALJ found that plaintiff had the RFC to perform the full range of light work, despite the RFC assessment form filled out by the main treating physician, and despite the absence of an RFC assessment form from any other physician, and despite the medical opinions of Doctors Salzberg, Scheinfeld, Neustadt, Hartman, Shulman and Dambrocia summarized by me at pages 19-20. Pursuant to 20 C.F.R. § 404.1567, "light work" involves:

> ... lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. ...

Dr. Salzberg was the only physician to issue a complete RFC physical assessment on a SSA form. (Tr. 277-81 dated November 7, 2005.) The only other complete physical RFC assessment was written almost a year earlier, by a non-physician, Kim Testa, who did not examine plaintiff. (Tr. 184-89.) Testa wrote the RFC assessment on December 24, 2004, and therefore did not have the benefit of seeing the numerous reports made in 2005 by the treating physician, including the November 2005 RFC assessment.

The ALJ conceded that the radiologist found that plaintiff has a herniated disc in his neck. (Tr. 18.) But the ALJ accused Dr. Salzberg of exaggerating a second disc (a lumbar disc) as herniated rather than bulging. That accusation appears to be unfounded. On February 23, 2004, Dr. Salzberg diagnosed a <u>herniated</u> disc at C6-C7 and a disc <u>bulge</u> at L5-S1 (see Tr. 222). Similarly, on November 7, 2005, on the RFC Assessment, he wrote:

> MRI C [cervical] spine 1/26/04 Herniated disc C6-C7.
> MRI LS [lumbar] spine diffuse disc bulge 1/26/04.

(Tr. 277 at ¶ 6.) It is true that, on one report, on October 31, 2005, he wrote "Herniated disc [singular] in neck & back." (Tr.

252.) However, as shown above, that mistake was not repeated on the RFC Assessment; therefore, the ALJ is unpersuasive when he attempts to use the earlier mistake to undermine the RFC Assessment. The ALJ wrote:

> The undersigned has not overlooked the residual functional capacity assessment prepared by the claimant's general physician, Dr. Salzberg, which is commensurate with less than a full range of sedentary work. However, Dr. Salzberg appears to have based his assessment more on the claimant's subjective complaints rather than on the objective clinical findings. As noted, his **conclusion** that the claimant has both a herniated cervical **and lumbar** disc is not consistent with the evidence of record. Moreover, his assessment is rebutted by several other examining physicians who opined that the claimant did not have significant physical limitations. Therefore, Dr. Salzberg's assessment is not afforded great weight.

(Tr. 18-19, emphases addded.)

It appears to me that the ALJ substituted his own judgment for that the treating physician, who was the one physician who completed an RFC Assessment. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), *quoting McBrayer v. Secty of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) ("the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion").

The ALJ wrote: "[T]he undersigned sees no reason why the claimant could not perform light work (i.e., stand/walk for up to 6 hours in an 8-hour workday and lift/carry up to 20 pounds)." (Tr. 18.) However, the only other person who came to that conclusion was the non-examining, non-physician Testa. The ALJ does not mention Testa, and with good reason. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999), *quoting Wagner v. Secty of Health and Human Servs.*, 906 F.2d 856, 862 (2d Cir. 1990) ("'a circumstantial critique by [a] non-physician[], however thorough or responsible, must be overwhelmingly compelling' to justify a denial of benefits."); *Pratt v. Astrue*, 2008 WL 2594430, at *11 (N.D.N.Y. June 27, 2008) (Kahn, J.) ("[T]he disability analyst is not considered an acceptable medical source under the Regulations. *See* 20 C.F.R. § 404.1513(a).").

Moreover, the ALJ failed to perform a function-by-function assessment of plaintiff's ability to do work-related activities

on a regular and continuing basis, such as sitting, pushing or
pulling. Nor did the ALJ assess whether plaintiff had any
postural, manipulative, visual, mental, or environmental
limitations or restrictions. *See* SSR 96-8p; *Alwashie v. Apfel*,
2001 WL 135768, at *5 (S.D.N.Y. Feb. 16, 2001) (Mukasey, J.)
("The RFC should be a function-by-function determination of the
claimant's ability to do work-related physical activities such as
sitting, standing, walking, carrying, lifting, or pulling, as
well as mental and other abilities.").

> Point 3: The ALJ did not properly assess
> plaintiff's credibility and complaints of pain.

At Tr. 18 and 20, the ALJ stated that he did not find
plaintiff's statements regarding his pain and functional
limitations to be credible to the incapacitating extent alleged:

> In this regard, there is no indication that the
> claimant has ever been hospitalized or that he ever
> sought hospital emergency room treatment for his pain.
> In addition, the various examining physicians did not
> report any significant loss of motion in the claimant's
> cervical or lumbar spine or upper or lower extremities.
> Likewise, these physicians did not note any severe
> muscle weakness, muscle atrophy, or significant
> neurological deficits that might normally be present in
> an individual claiming severe, debilitating pain. The
> claimant's activities, as described to Dr. Shulman in
> December 2004 included assisting his wife with the
> cooking, cleaning, laundry, and shopping.

(Tr. 18.)

20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 96-
7p set forth the standard an ALJ is required to use in evaluating
a claimant's credibility concerning his pain. 20 C.F.R. §
404.1529 says, in pertinent part, with my emphasis in bold font:

> (a) ... In determining whether you are disabled, we
> consider all your symptoms, including pain, and the
> extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical
> evidence and other evidence. ... **These include
> statements or reports from you, your treating or
> nontreating source, and others about your medical
> history, diagnosis, prescribed treatment, daily
> activities, efforts to work,** and any other evidence
> showing how your impairment(s) and any related symptoms

affect your ability to work.  We will consider all of your statements about your symptoms, **such as pain**, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms **affect your activities of daily living and your ability to work.**  However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled....

*    *    *

[(c)(2)]  Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. ...

[(c)(3)] ... Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account ....  We will consider all of the evidence presented, **including information about your prior work record**, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons....  Factors relevant to your symptoms, such as pain, which we will consider include:

> (i)  Your daily activities;

> (ii)  The location, duration, frequency, and intensity of your pain or other symptoms;

> (iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v)  Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi)  Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)  Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(a) and (c)(1), (2) and (3).  SSR 96-7p says, in pertinent part:

The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 C.F.R. 404.1529 ... requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision....

The Second Circuit has written:

... A proper consideration of credibility should have involved considering factors such as evidence of a good work record, which this Court views as entitling a claimant to 'substantial credibility.'

*Montes-Ruiz v. Chater*, 129 F.3d 114 (table), 1997 WL 710607, at *2 (2d Cir. Nov. 14, 1997), *quoting Rivera v. Schweiker*, 717 F2d 719, 725 (2d Cir. 1983).  In the case at bar, Mr. Kestler had a good work record.  He worked for 19 years, and then kept working for four months after his injury.  A year later, he got a job at an equipment rental center; he "had to leave after 5 weeks due to his neck and back pain" (Tr. 16, 295), even though it was a

"light work" job, and even though his bank was about to foreclose on his home (Tr. 313).

The ALJ mentioned plaintiff's long work record at Tr. 16, but he did not mention it at Tr. 18, when making his credibility analysis and finding that plaintiff's testimony about his pain and functional limitations was "not credible to the incapacitating extent alleged." "ALJs are specifically instructed that credibility determinations should take account of 'prior work history,'" and that "a good work history may be deemed probative of credibility." *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998).

Moreover, "[i]t is important to note that plaintiff's allegations need not be substantiated by medical evidence, but simply consistent with it." *Youney v. Barnhart*, 280 F.Supp.2d 52, 61 n.4 (W.D.N.Y. 2003). Not one of the doctors who examined plaintiff has disputed his complaints of pain. Indeed, plaintiff has been taking prescription pain medication since February 2004, and both Dr. Salzberg and Dr. Stern have recommended that plaintiff be treated by a pain management consultant. In March and April 2004, Dr. Scheinfeld diagnosed muscle spasm and low back pain. Moreover, both Dr. Scheinfeld and Dr. Salzberg found that plaintiff had limited range of motion in his neck at various times.

The ALJ did not ask plaintiff any questions relating to his daily activities. Instead, at Tr. 18, the ALJ relied on Dr. Shulman's December 2004 description of plaintiff's daily activities. The ALJ did not mention the more detailed description given by Dr. Hartman, who interviewed plaintiff on the same day. Dr. Hartman reported that plaintiff:

> prepares simple meals and is able to do some light cleaning. He does not do the laundry. He claimed he goes shopping for a few items at a time. ...

(Tr. 178.) Furthermore, the ALJ did not mention that Dr. Shulman wrote that plaintiff "is on pain medicines and bedrest," and that "activity makes the condition worse." She also stated that plaintiff described his pain as being a 9 on a scale of 1 to 10. (Tr. 180.)

I find that the ALJ did not properly assess plaintiff's credibility and his complaints of pain. On remand, the ALJ should follow the guidelines set forth in 20 C.F.R. § 404.1529 and SSR 96-7p in order to determine plaintiff's credibility.

## CONCLUSION

For the reasons stated above, (a) I grant plaintiff's motion for judgment on the pleadings (Docket #8); (b) I deny the Commissioner's motion for judgment on the pleadings (Docket #11); (c) I remand the case to the Commissioner for further proceedings consistent with this Opinion; and (d) I respectfully request the Commissioner to give this case expedited consideration.

I apologize for my own delay, but I note that the SSA delayed for more than a year in giving Mr. Kestler a hearing before an ALJ, even though his bank was preparing to foreclose on his home. (Tr. 27, 52, 313-14.) *See Shipman v. Astrue,* 2008 WL 216615, at *11 (S.D.N.Y. Jan. 23, 2008) (requesting expedited review on remand).

*[signature]*

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007

Dated:     New York, New York
           October 31, 2008

Copies of this Opinion and Order are being sent by mail to:

Gary J. Gogerty, Esq.
Drake, Loeb, Heller, Kennedy,
    Gogerty, Gaba & Rodd, PLLC
555 Hudson Valley Avenue, Suite 100
New Windsor, New York 12553

Susan C. Branagan, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007